**James R. SEALS, Jr., Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 17550.**

United States Court of Appeals
District of Columbia Circuit.

Argued May 16, 1963.

Decided Nov. 15, 1963.

Mr. Peter R. Cella, Jr., Washington, D. C., with whom Mr. William E. Stewart, Jr., Washington, D. C. (both appointed by this court), was on the brief, for appellant.

Mr. William C. Weitzel, Jr., Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., Frank Q. Nebeker, and Frederick G. Smithson, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WASHINGTON and McGOWAN, Circuit Judges.

WASHINGTON, Circuit Judge.

This is yet another case in which the central issue before us is whether the use of a confession in a criminal trial

should have been barred because it was allegedly the product of illegal detention by law enforcement officers. See Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

The bank robbery in which appellant Seals allegedly participated, and for which he was convicted, along with one Harold Greenwell, occurred on September 18, 1961.[1]

On September 25, 1961, at about 3:05 or 3:10 in the afternoon, Seals was walking in the vicinity of Bell Vocational High School, which he attended, in the Northwest section of Washington. He was then 19 years old. According to the Government's evidence, the following occurred: An agent of the Federal Bureau of Investigation approached Seals, identified himself, and showed his credentials. He asked Seals "if he minded stepping over to the automobile, I wanted to talk to him." Seals made no objection, followed the agent, and got in the back seat of the automobile.[2] Another agent took the wheel, drove a few blocks and parked the automobile. Seals was then informed that he was not under arrest, that he need not make any statement, and that anything he said could be used against him. After Seals said "I have not done anything. I don't mind talking," he was questioned about the bank robbery, a large sum of money thought to be in his possession, and the purchase of a pair of shoes. Seals had only about a dollar on his person and offered to go with the agents to his apartment, stating "you can search if you want to." He signed a form of consent for the search. They arrived at Seals' apartment at 3:45. Seals moved about freely while the agents searched the premises. He went to the kitchen for a glass and poured a shot of gin from a bottle. He drank it. Several other people, including one Floyd Davis, with whom Seals lived, were in the apartment at the time. Seals was not touched or questioned at his home.

At about 4:15 p.m. Seals was asked to come to the FBI Field Office in downtown Washington "to talk further"; "he volunteered to go." Floyd Davis and another man also went to the Field Office with the agents in the latter's cars. The group arrived at the building housing the Field Office at about 4:30. They went to the fifth floor of the building and entered the FBI offices through a gate manned by a male "receptionist," whose duty it was to inspect the pass or other credentials of the one entering before he admitted him.[3]

At 4:45 p. m., in one of the offices, the agents resumed their questioning of Seals. They advised him that he had a right to consult an attorney, to keep silent, that anything he said could be used against him, and that he was free to go at any time. The questioning continued for about an hour and forty-five minutes. Twice during the interrogation Seals asked if he was "locked up," and was advised that he was not. Seals was allowed to smoke. He was asked if he wished anything to eat and was offered milk to drink. He refused food and the milk but at his request he was on two occasions given a bottle of soda.

During the questioning Seals was asked to take a lie detector test. He

1. Both were charged under 18 U.S.C. § 2113(a). Both appealed their convictions to this court. Greenwell's appeal came on for hearing separately, and was decided on grounds not relevant here. See Greenwell v. United States, 115 U.S.App. D.C. 44, 317 F.2d 108 (1963).

2. Appellant's account is as follows: "I was walking south on Hiatt Place towards Irving Street and as I got a few yards away from the school building, two men came out of a vehicle and approached me and I had a notebook in one hand and one of them grabbed me by the arm and then they showed me a FBI badge and asked me to come over to the car with them. * * *" He characterized his own impression of this incident in these terms: "I figured it to be under arrest when they first grabbed me in front of the school."

3. Credentials were not asked for and examined when a person left. But there is nothing to show that Seals knew this.

stated that he wanted to take it in order to establish his innocence. He was brought to the fourth floor, where the polygraph operator in the presence of another agent told him that he did not have to talk, and did not have to take the test; that he had a right to consult a lawyer before talking; but that if he talked, what he said could be used against him in court. The operator then explained the complete operation of the lie detector and the test to him. After hearing this explanation, Seals stated that he did not wish to take the test. One agent thereupon told Seals that there were witnesses who could link him to the robbery. Seals asked to be confronted and the agent left to bring such a witness. Before the agent returned to the room, Seals began (about 7:10 p. m.) admitting his participation in the bank robbery. He was then notified that he was under arrest and was taken before a Commissioner within the hour.

After a hearing out of the presence of the jury, the trial judge found that the defendant was not under arrest before he confessed, saying in part:

> "[F]rom the evidence before me, [I hold] this man was free to go and further that at points which are important, he was advised that he could go.

> \* \* \*

> "This defendant from the stand, himself, stated there was no reason why he couldn't go." [4]

4. The reference by the trial judge apparently is to this exchange:
   "Q. Was there any reason why you didn't go?
   "A. Well—No sir."
   As heretofore noted, see fn. 2, appellant had stated his belief to be that he had been under arrest from the beginning. He also denied flatly before the jury that he had ever been told at the Field Office building at any time that he was free to leave, that he had a right to talk to a lawyer, or that he need not make a statement. Such conflicts in testimony concerning what is actually said and done in the privacy of police detention prior to arraignment seem almost inevitable. This is one of the problems

Viewing the evidence in the light most favorable to the Government, and giving the court's finding the great weight to which it is entitled, we must nevertheless conclude that Seals was under arrest at least from the time (about 4:30 p. m.) he was brought to the Field Office in the company of the agents. Such a conclusion seems to us well nigh irresistible. By that time, Seals "would have been rash indeed to suppose he was not under arrest," Kelley v. United States, 111 U.S.App.D.C. 396, 398, 298 F.2d 310, 312 (1961). From that point on he was in what was the equivalent of a police station, he was in the constant company of one or more FBI agents, and was subjected to almost constant interrogation. It seems to us that these circumstances dictate a finding that even without any physical restraint Seals necessarily must have understood that he was in the power and custody of the FBI and that he submitted to questioning in consequence. As we held in Coleman v. United States, 111 U.S.App.D.C. 210, 218, 295 F.2d 555, 563 (en banc 1961), this would constitute arrest, even though no actual force or visible physical restraint was used, or any formal declaration of arrest made.[5] The fact that Seals was told that he was free to leave and that he was not under arrest would hardly in the circumstances in which he found himself—never left alone and constantly in the company of FBI agents in their offices (observed by him to be

which Rule 5(a) was intended to obviate.

5. In finding that Seals was not in fact under arrest before he confessed, the trial judge did not make it clear whether he considered whether or not Seals had reason to believe and did believe that he was under arrest. This was a very pertinent, if not determinative point, as the Coleman and Kelley cases, cited above, make clear. And cf. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), holding that the defendants there were arrested when FBI agents waved their car to a halt and thus restricted their liberty of movement.

difficult of access and presumably thought to be difficult of exit)—suggest to him, a 19-year old high school student, that he was in fact free.[6]

The Government contends that the arrest did not occur until about 7:10 p. m., just after the appellant confessed. We have decided that the arrest occurred not later than 4:30 p. m. Whether the arrest was made with or without probable cause is not something we can readily determine from the record before us. But either alternative defeats the Government. If the arrest was made on probable cause, Seals should have been taken without delay to a magistrate. If there was no probable cause, he should not have been arrested.

█ Following his arrest, Seals was subjected to constant questioning and was not taken before the United States Commissioner until 7:45 p. m., after his confession had been obtained. This unexplained delay of more than three hours was unnecessary and unreasonable within the meaning of *Mallory v. United States, supra*. There the Supreme Court said (354 U.S. at 454–455, 77 S.Ct. at 1359–1360, 1 L.Ed.2d 1479):

> "The police may not arrest upon mere suspicion but only on 'probable cause.' The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. * * *
>
> [H]*e is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt.*
>
> " * * * [T]*he delay must not be of a nature to give opportunity for the extraction of a confession.*" (Emphasis added.)

It follows that it was error to allow the appellant's confession, obtained as a result of the unnecessary delay in arraigning him, to be put before the jury. Fed.R.Crim.P. 5(a); Mallory v. United States, supra; McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

The case is reversed and remanded for a new trial, with directions to exclude evidence as to the defendant's confession obtained during his detention at the FBI Field Office.

So ordered.

---

6. This case is very different from the situation in Scarbeck v. United States, 115 U.S.App.D.C. 135, 317 F.2d 546 (1962), cert. denied, 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963). There Scarbeck, an experienced foreign service officer of the State Department, was involved in a matter thought to affect the security of the United States. He was questioned by FBI agents during the course of three days in the State Department building and was released to security officers of the State Department for lunch and following the questioning at the end of each day. These were not police officers in the ordinary sense and they had no power to arrest. Following the completion of the questioning Scarbeck was suspended by the State Department and was no longer accompanied by the security officers. For the balance of that day and two days thereafter he was free to come and go as he liked. On the morning of the fourth day he was arrested on a warrant by the FBI on the street and promptly taken before a United States Commissioner.

The situation in United States v. Vita, 294 F.2d 524 (2d Cir. 1961), cert denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962), though generally similar to the one before us, is distinguishable in at least one important respect. Vita was "a twenty-eight-year-old high school graduate who had prior experience with the criminal law * * *" 294 F.2d at 534. Seals was young and still a student.