**UNITED STATES of America,
Appellant,**

v.

**Warren J. COATES.**

**No. 73–1403.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 6, 1973.

Decided March 12, 1974.

Peter K. Mair, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Paul L. Friedman, Asst. U. S. Attys., were on the brief, for appellant.

William J. Garber, Washington, D. C. (appointed by this Court) for appellee.

Before McGOWAN, TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This is an appeal by the Government from an order of the District Court suppressing as evidence a sawed-off shotgun and shotgun shells removed from the defendant's person. A police officer's discovery of these items led to a three-count indictment that charged defendant with possession of an unregistered firearm, 26 U.S.C. § 5861(d); a firearm not identified by serial number, 26 U.S.C. § 5861(i); and a prohibited weapon, 22 D.C.Code § 3214(a). We reverse and remand.

## I. STATEMENT OF FACTS

At the suppression hearing, the testimony of the sole witness, Officer Bryant Anderson, Jr., of the Metropolitan Police, set forth the following events. On Saturday, October 7, 1972, at about 8:30 p. m., Officers Anderson and Himes went to the Whitelaw Hotel at 1839–13th Street, N.W., Washington, D.C. The owner of the hotel had requested the police to give special attention to the building "because of the high crime rate in his building." (Tr. 7). Officer Anderson's assigned duties had included patrol of the area where the Whitelaw Hotel is located for about two years, and he was able to recognize most of the permanent residents of the hotel. (Tr. 7, 10). When visiting the hotel in response to the owner's requests his usual practice is to inspect the common hallways and lavatories to ascertain whether persons he encounters there have a legitimate purpose in being present in the hotel. Upon meeting a person he does not recognize as a hotel guest, his normal procedure is to ask the person to produce identification and to explain his business in the hotel.

When Officer Anderson was asked whether he searches or frisks individuals he encounters, he replied that he does so "most of the time, especially in the wintertime when they wear long heavy coats where they can conceal weapons easily." (Tr. 9–10). The officer added that he is likely to frisk someone "if the individual cannot give a good explanation of why he is in the building.
. . . ."

As to the night of October 7, Officer Anderson testified that he and Officer Himes alerted the hotel clerk of their presence and began their inspection of the hotel, starting on the first floor and proceeding to the floors above. They had just started up to the fourth floor when, in Officer Anderson's words—

We just started up the first flight of stairs between the third floor and the landing between the third and fourth floors, about halfway up Mr. Coates came around, came down from the fourth floor, hit the middle landing and was just making the turn to come down that second set of stairs. As he made the turn he spotted myself and Officer Himes. As soon as he saw us he made a quick move to go back up the stairs, run up the stairs. It was quite a jerky move. I yelled to him to hold it. He looked at us for just a split second and shrugged his hands down alongside of his legs and said "shit", in a disgusted manner. (Tr. 13)

Officer Anderson was asked why he had instructed Mr. Coates to "hold it." He replied, "Mr. Coates looked like he was on the verge of fleeing for some reason unknown to me at that time." (Tr. 14)

Officer Anderson was asked what happened next. He continued:

At that point Mr. Coates had an advantage on me as far as height. My head was approximately belt-level to him which gave him a very good kicking position if he chose to do it. Seeing this advantage, I placed my left hand on his mid-section to walk him back away from the edge of the stairs so I could get even with him. When I did I felt the butt of the sawed-off shotgun tucked down inside of his pants and under his jacket. (Tr. 14–15).

From the contact of his hand against the defendant's jacket, Officer Anderson was confident he had felt the butt of a sawed-off shotgun or rifle. (Tr. 16). Officer Anderson walked the defendant away from the stairs and asked him what was in his pants. When Mr. Coates replied "nothing," the officer reached into the defendant's jacket and removed a sawed-off shotgun. The officers thereupon conducted a complete search of the defendant's person and found two shotgun shells in his jacket pocket. The shotgun itself was found to be loaded.

On cross-examination, Officer Anderson further testified that the movement by defendant that preceded the command to stop was not a turning around but "a quick motion to the right as if to bolt . . . " (Tr. 24). Was Mr. Coates "free to go" after he was directed to "hold it"? "Not until we checked him," the officer responded. (Tr. 23).

Further questioning of Officer Anderson about placing his hand on the de-fendant as he ascended the stairs, proceeded as follows (Tr. 32):

Q: Now, when you say that you reached out, did you push him forcefully?

A: No, Sir. Mr. Coates wasn't fighting or causing any immediate danger at that moment. All I did was place my hand on his stomach above the belt-level in order to protect myself as far as a kick or a movement trying to run me over and back him back.

Q: Would you have done that with any individual in the Whitelaw Hotel, any male that you had come in contact with under those circumstances?

A: Yes, Sir, I would have.

Would he have frisked the defendant had he not felt a weapon at the initial touching? Officer Anderson replied "possibly not," noting that the defendant's clothing was not bulky and that he saw no bulges. When defense counsel asked whether prior to the initial physical contact he had reason to fear that Mr. Coates was armed, the officer responded "I am always in fear that someone is armed." (Tr. 33–34).

Asked by the Court whether he had been kicked by someone standing at a higher level, Officer Anderson answered that such an incident had occurred some three-and-a-half years earlier, when he was responding to a disorderly person call.

After the foregoing testimony the District Court ruled on January 26, 1973, that it would grant the motion to suppress. Its ruling is in the margin.[1]

1. THE COURT: I am going to grant the motion to suppress. I find that in this hotel that admittedly is a transients hotel two police officers entered one night at the request of the owner because crimes had been committed in and around that hotel for sometime.

And at the request of the owner and the knowledge of the Clerk at the desk the two officers began inspecting and checking out the place, the first floor, the second floor and the third floor and they were on their way up to the fourth floor on the steps, which steps were in the form of two flights, and the officer found about three steps above him in the middle of the steps this defendant, who came down and he looked at them and they looked up at him. He raised his hands and then dropped them and used some language and the officer said, stop.

Then the man did stop and he didn't do anything to indicate that he was going to do anything to the officer. The officer said he could have turned and run up the steps but

The Government asked the District Court for a ruling that was more specific as to the ground on which the evidence was suppressed. The Court complied with the request, stating on February 2, 1973:

. . . I find and conclude that the defendant was under arrest as the officer stated.

He said he would not let him move and he would not permit him to leave and that he acted without probable cause and found a transient on the steps and said he thought he was going to be kicked so he put his hand up and definitely that man was under arrest. He could not move. He did not use the word "arrest."

I find no probable cause for arrest and the search was as a result. (Supp. Tr. 3).

## II. DISPOSITION

### A.

■■ The District Court's ultimate ruling reflects a legal conclusion that Officer Anderson placed the defendant under arrest when he told the latter to "hold it," and that this action violated the Fourth Amendment unless supported by probable cause.[2] This conclusion was erroneous. Ever since Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), Fourth Amendment jurisprudence has recognized a variety of police encounters with citizens which limit personal freedom but do not amount to arrests. These lesser intrusions, including "stops" and "frisks," are constitutional

even in the absence of probable cause required for arrest so long as they satisfy the test of "reasonableness," ascertained by balancing the Government interest further by police action against the invasion of individual privacy. 392 U.S. at 20–21, 88 S.Ct. 1868. The latest word on this kind of police activity appeared in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), where the Supreme Court held that a police officer may constitutionally detain a person "to determine his identity or to maintain the status quo momentarily while obtaining more information," expressly viewing such an action as a forcible, but temporary, detention. 407 U.S. at 146, 92 S.Ct. at 1923. Because the District Court erroneously measured Officer Anderson's action against the probable-cause-to-arrest standard, we must reverse.

### B.

The Government asks us to go further and rule that throughout his encounter with the defendant, Officer Anderson acted reasonably, both in ordering the defendant to stop and in placing his hands upon the defendant's midsection, the gesture which led to discovery of the concealed firearm. Such a determination, however, must await further examination by the District Court. We say this having in mind that although the District Judge erred in saying in his supplementary statement that there was a need for probable cause to support an arrest, what he may have had in mind was a conviction that under the totality of the circumstances the police officer

---

actually didn't run, and he didn't turn. He made some kind of a movement but it was not a running movement.

But with that the officer put out his hand against the stomach of the defendant, who was some three steps above him. The officer said this was to protect himself from being kicked. Well, the officer said his head was at the belt-level of the defendant and he put his hand up above him around the belt. I don't see how that could have stopped a kick.

In any event, there was no kick and the man was just standing there. And by put-

ting his hand up against the defendant's belt the officer felt the butt of a gun. The officer then checked the man out and searched him and found there was a sawed-off shotgun that has been admitted here in evidence.

I think this was an illegal search. I am going to grant the motion to suppress.

2. We are concerned here only with Fourth Amendment limitations on police conduct, since there is no contention that the behavior of Officer Anderson exceeded statutory or other limitations on his authority.

acted unreasonably. Our remarks should not be taken as any indication of approval or disapproval of such a conclusion. Rather, we think that an appellate ruling should be preceded by further reflection on the underlying problems by counsel and by the trial judge.

This case requires a further fleshing out of the justification required by the Fourth Amendment for various encounters between police and citizens. *Terry* and *Adams* dealt with a police officer's constitutional power to detain suspects, and to disarm them, under circumstances suggesting the commission of a particular crime. Cases in this circuit since *Terry* have involved similarly suspicious circumstances.[3] But police encounters with citizens are not all of a single kind. They are, as the Supreme Court observed in *Terry*, "incredibly rich in diversity." 392 U.S. at 13, 88 S. Ct. 1868. Analysis is not aided by labelling them all as "stops." Encounters vary in the degree of intrusion; plainly there is a difference between an order to stop and give identification and a command to remain in a certain place for questioning for as long as twenty minutes.[4] And although some restraint and constraint may be present whenever

police officers confront citizens to ask questions, *see* Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968), such encounters differ in their potential for intimidation and abrasion.[5] Delineation of the Fourth Amendment limitations on police investigative activity must proceed with sensitivity to these differences.[6]

Plainly the circumstances under which Officers Anderson and Himes met the defendant, as they appear in this record, are less supportive of suspicion of criminal conduct than the circumstances we have encountered in our previous cases.[7] Without implying that the same degree of suspicion is required to justify the police officers' actions in this case, we note that our remand provides an opportunity to the Government to supplement its evidentiary presentation, focusing on any further facts which explain the officers' particular response. In addition, the remand will give the Government an opportunity to clarify whether it relies upon a police authority to respond to particular suspicious circumstances and threats of crime present here, or upon a more generalized police power to stop persons momentarily and ask their business.[8]

---

3. *See, e. g.*, United States v. James, 147 U.S.App.D.C. 43, 452 F.2d 1375 (1971) (informant's tip that suspects were carrying narcotics) ; Young v. United States, 140 U.S.App.D.C. 333, 435 F.2d 405 (1970) (suspects riding in car observed tailing bank delivery truck) ; United States v. Hines, 147 U.S.App.D.C. 249, 455 F.2d 1317, cert. denied, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972) (suspect observed fleeing from scene of robbery). *See also* Stephenson v. United States, 296 A.2d 606 (D.C.Ct.App. 1972), reviewing the "stop-and-frisk" cases in the District of Columbia Court of Appeals.

4. Compare ALI, Model Code of Pre-Arraignment Procedure, § 110.2(1) (Official Draft No. 1, 1972), authorizing stopping of persons under certain circumstances for a period not to exceed twenty minutes.

5. To the extent that there is an element of constraint inherent in any police-citizen encounter, the Supreme Court has declined to treat that fact as decisive in a determination whether consent to a police search is volun-

tary. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

6. *See* Bailey v. United States, 128 U.S.App. D.C. 354, 361, 389 F.2d 305, 312 (1967) (Leventhal, J., concurring).

7. The officers met Mr. Coates on the stairs, a place where they could expect to encounter guests, since the Whitelaw Hotel has no elevator for use of its patrons. Officer Anderson testified that he did not recognize Mr. Coates as a permanent hotel resident, but he added that the hotel has transient guests whom he would not recognize by sight, and both permanent and transient paying guests might themselves invite persons who reside elsewhere to their rooms. The time of the encounter was 8 :30 p. m. on a Saturday night—not an hour at which the mere presence of someone up and about in the hotel may fairly arouse suspicion.

8. Metropolitan Police Department General Order No. 304–10, effective July 1, 1973, prescribes procedures for "police-citizen contacts, stops, frisks, and motor vehicle spot checks." The directive defines a "contact"

There is in this case the additional fact of Officer Anderson's placing his hands on the defendant. The Government makes the point that this action was not a full-fledged pat-down for weapons, which the Supreme Court has indicated is not necessarily justified in all situations where an officer may detain for investigation. Adams v. Williams, *supra*, 407 U.S. at 146, 92 S.Ct. 1921. Yet an assessment of the reasonableness of police action must reflect an awareness that non-consensual physical contact represents a special intrusion into a person's privacy. The mere fact that an officer may reasonably stop someone to ask questions does not necessarily make it reasonable for the officer to lay his hands on the person involved. Sanctity of the person is a concern of the law generally, and a special concern of the Fourth Amendment in particular.

Fourth Amendment jurisprudence involves prudence for the police as well as fairness for citizens. A police officer "need not defer . . . protective measures to the point of peril." Young v. United States, *supra*, 435 F.2d at 409. Courts must be careful not to use hindsight in limiting the ability of police officers to protect themselves as they carry out missions which routinely incorporate danger.[9] On the other hand, law enforcement officers must be sensitive to the rule that requires an articulable justification under the circumstances for laying their hands on a citizen; scrutiny of that justification must include such matters as whether less intrusive protective measures were available and unreasonably ignored. Officer Anderson's testimony in this case that he is "always in fear that someone is armed" properly reflects the need for police to be prepared for any contingency, but it does not support a routine authority to conduct a pat-down of any and all citizens a policeman encounters.

The judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.

So ordered.

---

as "face-to-face communication with an individual under circumstances in which the individual is free to leave," and a "stop" as a "temporary detention of a person for the purpose of determining whether probable cause exists to arrest." This directive is an illustration of the kind of police practice which may become relevant on remand, when the District Court may inquire whether similar guidelines were in effect at the time the police officers encountered Mr. Coates.

9. "As a society, we routinely expect police officers to risk their lives in apprehending dangerous people. We should not bicker if in bringing potentially dangerous situations under control they issue commands and take precautions which reasonable men are warranted in taking." Bailey v. United States, 128 U.S.App.D.C. 354, 364, 389 F.2d 305, 315 (1967) (Leventhal, J., concurring).