## UNITED STATES of America

### v.

### Joyce E. HALL, a/k/a Joyce E. Sutton, Appellant.

### No. 74–1190.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 31, 1974.

Decided Jan. 8, 1976.

Bradley Johnson,* with whom Sherman L. Cohn, Washington, D. C. (appointed by this Court), and David J. Gottlieb,* were on the brief for appellant. Cornish Hitchcock * and John O'Donnell * also entered appearances for appellant.

---

* Entered appearances as student counsel pursuant to Rule 20 of the General Rules of this Court.

Paul N. Murphy, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty. and John A. Terry, Asst. U. S. Atty., were on the brief for appellee.

Before ROBINSON and ROBB, Circuit Judges, and MARKEY,** Chief Judge, United States Court of Customs and Patent Appeals.

ROBB, Circuit Judge:

The appellant Hall, referred to here as the defendant, was indicted for possession of a controlled substance, 61 tablets of phenmetrazine (also known as preludin), with the intent to distribute in violation of 21 U.S.C. § 841(a). Her motion to suppress evidence—the 61 tablets—was heard and denied. Trial by jury resulted in a verdict of guilty and she was sentenced to imprisonment for five years pursuant to 18 U.S.C. § 4208(a)(2), to run concurrently with a sentence imposed on her in another case. She appeals. The only question on appeal is whether the District Court properly denied the motion to suppress. We affirm.

At about half past six on the evening of May 16, 1973 Officers Haskins and Kane of the Metropolitan Police were on patrol in their marked cruiser. In the 1800 block of 13th Street, N. W. in Washington they stopped a green Volkswagen because it had a broken windshield. The car was occupied by the driver and a passenger on the front seat. After the Volkswagen stopped Officer Haskins saw both occupants bend forward, the driver leaning to his right across the passenger, and apparently "passing something between each other" in a "secretive" and "unusual" manner. As Haskins approached on foot, the passenger, later identified as the defendant Hall, got out and began to walk away from the Volkswagen "as though she was trying to leave the scene." Officer Haskins testified: "I stopped her by asking for identification. She stopped and leaned up against the fence, and gave me an ID card, which had identification which identified her as being Joyce E. Sutton. The ID at that time appeared to be valid." Continuing, Officer Has-

kins testified that after looking at the ID card he asked the defendant what she passed to the driver.

She stated that the driver had given her a pack of cigarettes.

I asked her, could I see the cigarettes.

At that time, she reached into her right pocket and exposed a white top, which appeared to be on a medicine bottle. Immediately after exposing this bottle, she pushed it back into her pocket; and using her left hand, reached in her left pocket and pulled out the pack of cigarettes.

After pulling out the cigarettes, I asked her to let me see what she had in her right pocket.

She said that it was medicine that she had just found at Seventh and Florida Avenue.

The defendant's reactions had made the officer suspicious, and prompted his request to see the bottle, because

. . . first of all, she gave me the impression, upon stopping the vehicle, she got out of the car, and she began walking away, as though she was saying to the driver: This is where I want to get off. And she began to leave the scene. That particular area, there is a lot of drugs of this nature being sold there. The way she pushed her hand back in the pocket to try to hide the evidence or medicine, or what have you, gave me the impression that she was carrying in her possession drugs, illegal drugs,

. . . . . .

In response to the officer's request the defendant handed him the bottle. Examining it the officer noticed that the label reflected a prescription for one Sabata Hardy. There were 30 yellow pills in the bottle, and from his experience the officer thought they were probably a drug called preludin, also known under the "street name" of "Bam".

After looking at the bottle and its contents Officer Haskins told the defendant he wanted her to come down with him to police headquarters. At this point the

** Sitting by designation pursuant to 28 U.S.C. § 293(a).

defendant pulled off her ring, gave it to the driver of the Volkswagen, and asked him to give it to the defendant's brother. She also asked the driver to give her brother a sweater that she had over her arm. Before the sweater was handed to the driver Officer Haskins examined it and found in the right pocket a bag in which was another bottle containing 31 yellow pills. The label on this bottle indicated that the pills had been prescribed for one Eddie Robinson. Both prescriptions were written by the same doctor. The proof at trial was that the pills were in fact preludin and the evidence indicated that preludin pills sell "on the street" for $8.00 apiece.

The district judge held:

Defendant's motion to suppress is denied. The drugs were in plain view, and on the special facts of this instance defendant volunteered to show them to the Officer during his initial proper inquiries.

■ The stopping and questioning of the defendant Hall by Officer Haskins was not an arrest but was a reasonable course of action in light of the circumstances confronting the officer; and being reasonable it was lawful. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Coates*, 161 U.S.App.D.C. 334, 495 F.2d 160 (1974); *Cheung Tin Wong v. Immigration & Naturalization Service*, 152 U.S.App.D.C. 66, 468 F.2d 1123 (1972); *United States v. Hines*, 147 U.S.App.D.C. 249, 455 F.2d 1317 (1971), *cert. denied*, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972); *United States v. James*, 147 U.S.App.D.C. 43, 452 F.2d 1375 (1971). In *Adams v. Williams*, the court said:

In *Terry* this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.*, at 22, 88 S.Ct. at 1880. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. *See id.*, at 23, 88 S.Ct. at 1881. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. *Id.*, at 21–22, 88 S.Ct. at 1879–1880; see *Gaines v. Craven*, 448 F.2d 1236 (CA9 1971); *United States v. Unverzagt*, 424 F.2d 396 (CA8 1970).

■ Whether an officer's conduct was "reasonable" or "appropriate" depends on the facts and circumstances of the particular case, so that the decision in one case seldom furnishes a pat answer in another case. *See Bailey v. United States*, 128 U.S.App.D.C. 354, 357, 389 F.2d 305, 308 (1967); *Hinton v. United States*, 137 U.S.App.D.C. 388, 391, 424 F.2d 876, 879 (1969). A principle to be applied generally however is that in judging the reasonableness of the actions of the officer the circumstances before him are not to be dissected and viewed singly; rather they must be considered as a whole. So considered they are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training. *See United States v. Davis*, 147 U.S.App.D.C. 400, 458 F.2d 819 (1972).

We apply the test of *Terry v. Ohio, Adams v. Williams, United States v. Coates* and similar cases to the facts of the case before us, considering these facts as a whole. The defendant was in an area where "a lot of drugs [were] being sold"—a factor which the officer noted and might properly consider. *United States v. Davis, supra*, 147 U.S. App.D.C. at 403, 458 F.2d at 822 (1972); *see Adams v. Williams, supra*, 407 U.S.

at 147–148. After the Volkswagen stopped the officer noticed a "secretive" and "unusual" "passing [of] something" between the defendant and the driver of the car. The defendant then got out and started to walk away, conduct not usual for a passenger in an automobile stopped for a traffic violation. The officer at this point had a right to ask the defendant for identification and to question her briefly about what had transpired between her and the driver of the car. When she produced a bottle from her pocket, apparently by mistake, and then "pushed her hand back" as if to "try to hide the evidence", this furtive action entitled the officer to ask for more information. In the light of his suspicions, which we think were reasonable, he was not required to shrug his shoulders and allow a suspected criminal to walk away. In response to his further and proper inquiry the defendant handed him the bottle of pills. As the district judge no doubt had in mind when he found that the defendant "volunteered to show" the drugs, at no time did the officer lay his hand on the defendant, or threaten her, or do more than by questioning attempt to obtain information. There was no unreasonable search and seizure.

▮ When the defendant produced the bottle of pills, which the officer believed to be preludin, he had probable cause to arrest her and he did so. The seizure of the drugs from her sweater, which followed, was valid as an incident to the lawful arrest.

The judgment is affirmed.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge (dissenting):

The District Court denied appellant's motion to suppress evidentiary use of the 61 phenmetrazine tablets on the grounds that they were "in plain view" when seized and that appellant had "volunteered to show them to [Officer Haskins] during his initial proper inquiries."[1] In affirming appellant's conviction, this court concludes more elaborately that the on-street detention that eventually led Officer Haskins to the drugs were in harmony with Terry v. Ohio.[2] I respectfully dissent. I would hold the stop and interrogation unlawful under Terry, and in that view would reach no other issue in the case.

I

I agree with my colleagues that it is essential to find the investigatory stop lawful before the seizure could possibly be justified as the result either of a plain view by Officer Haskins or a voluntary surrender by appellant. Since the interrogation was the object of the stop, and the seizure was the product of the interrogation, the seized evidence was fatally tainted if those forerunning events were illegal,[3] regardless of any predicates for

1. In its entirety, the District Court's ruling was:

Defendant's motion to suppress is denied. The drugs were in plain view, and on the special facts of this instance defendant volunteered to show them to the Officer during his initial proper inquiries.

(Order filed Nov. 5, 1973).

2. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

3. The sequence of events preceding appellant's arrest commenced when Officer Haskins stopped an automobile because it had a defective windshield. As the officer approached the stopped vehicle, he saw the driver lean toward appellant, the passenger on the front seat, who moments later began to walk away from the car. The officer stopped her and requested identification, to which she made an apparently satisfactory response. Officer Haskins proceeded to question her as to what had occurred as the car was being stopped. She replied that the driver had given her a package of cigarettes, which the officer demanded to see; and in reaching into her pocket to get the cigarettes, she accidentally exposed the white cap of a medicine bottle. The officer questioned her about the bottle and requested to see it, and appellant complied. After examining pills contained in the bottle, and noting that the label bore a name different from that on her identification, she was placed under arrest. Appellant then handed the driver a ring she was wearing and a sweater she was carrying, to be given to her brother while she

admissibility at appellant's trial. As the fruits of an unconstitutional intrusion, the drugs must be suppressed whether or not they later came legitimately into the officer's view or were willingly and intelligently surrendered to him during his encounter with appellant.[4] The threshold question, then—and the only question I see any need to consider—is the validity of the initial stop and the ensuing interrogation in light of *Terry*.

To accommodate competing interests in personal privacy and crime detection, the Supreme Court in *Terry* defined standards by which police detentions are to be tested in situations involving less than the probable cause required for a lawful arrest. Even a temporary stop on the street comes within the purview of the Fourth Amendment's stricture on seizures of the person,[5] and consequently calls for careful judicial scrutiny as to its reasonableness.[6] "[A] police officer may in appropriate circumstances and in an appropriate manner approach a person," the Court declared, "for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest; "[7] but "in justifying the particular intrusion," the Court cautioned, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[8] "This demand

for specificity in the information upon which police action is predicated," the Court reminded, "is the central teaching of . . . Fourth Amendment jurisprudence."[9] In evaluating the reasonableness of a bodily seizure, the Court stressed that an objective standard must be employed:

> [W]ould the facts available to the officer at the moment of the seizure or search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? . . . Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.[10]

## II

In the case at bar, Officer Haskins could testify to no "specific and articulable facts" upon which his investigatory stop might be justified. The most that can be summoned from the record to support his action is (a) that after being flagged to a halt for a broken windshield, the driver of the car "pass[ed] something" to appellant, a front-seat passenger, in a "secretive" manner;[11] (b) that the neighborhood in which the car was detained was a "high narcotics" area; and (c) that after the car came to rest, appellant got out and began to

---

was detained. The officer examined the sweater before it was relinquished and found another bottle of pills. Surviving appellant's motion to suppress, these drugs were introduced in evidence against her, and formed the basis for her conviction.

**4.** *Wong Sun v. United States*, 371 U.S. 471, 484–485, 83 S.Ct. 407, 415–416, 9 L.Ed.2d 441, 453–454 (1963). See also *Harrison v. United States*, 392 U.S. 219, 222–224, 88 S.Ct. 2008, 2010–2011, 20 L.Ed.2d 1047, 1051–1052 (1968).

**5.** *Terry v. Ohio, supra* note 2, 392 U.S. at 17–19, 88 S.Ct. at 1877–1879, 20 L.Ed.2d at 903–905.

**6.** *Id.* at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905.

**7.** *Id.* at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

**8.** *Id.* at 21, 88 S.Ct. at 1879–1880, 20 L.Ed.2d at 905–906.

**9.** *Id.* at 21 n. 18, 88 S.Ct. at 1880 n. 18, 20 L.Ed.2d at 906 n. 18 (citations omitted).

**10.** *Id.* at 21–22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906 (citations and footnote omitted). Consequently,

> simple " 'good faith on the part of the arresting officer is not enough.' . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police."

*Id.,* quoting *Beck v. Ohio,* 379 U.S. 89, 97, 85 S.Ct. 223, 229, 13 L.Ed. 2d 142, 148 (1964).

**11.** See text *infra* at notes 12–14.

walk away. When this testimony is carefully analyzed, it becomes apparent that it falls short of the requirements laid down in *Terry.*

That, for the first purported justification, Officer Haskins had no more than an unparticularized suspicion is unmistakably clear from his testimony. On direct examination he first stated that "before approaching the Volkswagon, I observed the driver and passenger leaning forward in the vehicle, and the driver leaning across the passenger or to his right." [12] It was then that the prosecutor, questioning Officer Haskins, originated the notion that "something" was "pass[ed]" and the characterization of the event as "secretive." "When you saw the Defendant and the driver of the car passing something," he asked, "did they appear to be doing it in a surreptitious manner, a secretive manner, or not?",[13] a version in which the officer then acquiesced. But when the court itself delved into the "secretive" "pass[ing]" of "something," it turned out that there simply was no "pass[ing]," "secretive" or otherwise:

> [THE COURT]: They were both just leaning forward?
>
> [THE OFFICER]: Yes.
>
> [THE COURT]: You saw no hand movements?
>
> [THE OFFICER]: Well, inside a Volkswagon. Volkswagon seats are very close together, so I couldn't see.
>
> [THE COURT]: All you saw was that both the woman and the man bent forward?
>
> [THE OFFICER]: Right, Yes, sir.[14]

Next in the attempt to find "specific and articulable facts" in the officer's testimony is a brief remark that the car in which appellant was riding was stopped "in an area where 'a lot of drugs [were] being sold.'" [15] It is evident, however, that the car was simply passing through the area when the police officers halted it because it had a broken windshield—a circumstance, incidentally, wholly unrelated to the reputation of the area or to the reasons for the later interrogation. Every day many people drive through high-crime, high-narcotics neighborhoods on their way to other parts of the city. From aught that appears, no more was occurring here.[16]

The third and last "suspicious circumstance" to which Officer Haskins testified was that appellant alighted from the car after it was halted and "began to leave the scene." [17] My colleagues, no less than the parties, refer to this event as "flight." To be sure, "[w]ith cautious application in appreciation of its innate shortcomings, flight may under particular conditions be the basis for an inference of consciousness of guilt," [18] but al-

---

**12.** Transcript of Hearing on Motion to Suppress (hereinafter "Tr.") at 5.

**13.** Tr. 10.

**14.** Tr. 15.

**15.** Tr. 10. In *Adams v. Williams,* 407 U.S. 143, 147–148, 92 S.Ct. 1921, 1924, 23 L.Ed.2d 612, 617–618 (1972), the Court, in evaluating the adequacy of a police officer's suspicion prompting an investigatory stop, did look to a neighborhood's reputation for narcotics traffic, but only to corroborate the tip of a previously reliable informant. Similarly, in *United States v. Davis,* 114 U.S.App.D.C. 400, 403, 458 F.2d 819, 822 (1972), when events witnessed by a police officer included an exchange of a package for cash in a "stealthy manner" on a street in a high-crime area, this court held that the character of the neighborhood is a valid consideration, but only "when coupled with other reliable indicia or suspicious circumstances."

While the circumstances in *Davis* did reveal indicia of that caliber, those disclosed by the record in the instant case, to say the least, are extremely weak by comparison.

**16.** As the District Court observed during the course of the suppression hearing,

> [The police officer] stopped a car with a broken windshield. A passenger who had nothing to do with the matter got out. Why did he stop her? What had she done? What possible involvement could she have had in the offense? . . . Don't you see traffic accidents all the time when people in taxicabs get out and walk away, go about their business, . . . and leave the cab driver to argue the issue out?

Tr. 25-26.

**17.** Tr. 9.

**18.** *Bailey v. United States,* 135 U.S.App.D.C. 95, 100, 416 F.2d 1110, 1115 (1969) (footnote

ready this court has taken pains to warn of "the dangers inherent in unperceptive reliance upon flight as an indicium of guilt.[19] Years ago the Supreme Court admonished that "it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses;"[20] in similar vein, we ourselves have declared that flight is not a "reliable indicator of guilt without other circumstances to make its import less ambiguous."[21] Assuming even that the few steps which appellant took from the stopped vehicle amounted to flight,[22] the record hardly reflects "other circumstances which [would] make [their] import [so] less ambiguous" as to reach an acceptable level of reliability.[23]

*Terry* delineates a carefully formulated standard governing a branch of police activity designed to control crime on the streets. The factual ingredients of police encounters with citizens are not all of a single kind; indeed, they can be "incredibly rich in diversity."[24] They vary immensely in practically every aspect, ranging from the occasion for to the degree of intrusion,[25] and it may well be a mistake to attach the same importance to a particular fact in every form of police contact with the public. Each set of circumstances presents its own problems when the mandate of *Terry* comes to the fore.

The problems here, in my view, must be resolved in appellant's favor. Officer Haskins is unable "to point to specific and articulable facts which" even when embellished maximally "with rational inferences from those facts," could "reasonably" have "warranted" the "intrusion."[26] Put another way, "the facts available to the officer at the moment of the seizure" were insufficient to " 'warrant a man of reasonable caution in the belief' that the action taken was appropriate . . . ."[27] At the very most, Officer Haskins' testimony portrays only a nebulous hunch that appellant was doing or was about to do something wrong.[28] By the *Terry* standards that is not enough.

omitted). See also, *e. g.,* the cases cited *id.* at 99 n. 29, 416 F.2d at 1114 n. 29.

**19.** *Id.* at 99, 416 F.2d at 1114. We added that "[w]e no longer hold tenable the notion 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.' " *Id.* at 99–100, 416 F.2d at 1114–1115, quoting *Alberty v. United States,* 162 U.S. 499, 511, 16 S.Ct. 864, 868, 40 L.Ed. 1051, 1056 (1896).

**20.** *Alberty v. United States, supra* note 19, 162 U.S. at 511, 16 S.Ct. at 868, 40 L.Ed. at 1056. The question whether "flight justifie[s] an inference of guilt sufficient to generate probable cause for . . . arrest" and the question "whether . . . flight would serve to corroborate proof of . . . guilt at trial" "are inescapably related" with the result that on probable-cause issues "it is relevant . . . that [the Supreme Court has] consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime." *Wong Sun v. United States,* supra note 4, 371 U.S. at 483 n. 10, 83 S.Ct. at 415 n. 10, 9 L.Ed.2d at 452 n. 10. The same consideration is relevant on the issue of justification to make an investigatory stop which is presented in the instant case.

**21.** *Hinton v. United States,* 137 U.S.App.D.C. 388, 391, 424 F.2d 876, 879 (1969).

**22.** Mere departure from the scene is not flight, nor does it bear any potential legal importance of flight. *State v. Sullivan,* 43 N.J. 209, 203 A.2d 177, 192 (1964), *cert. denied,* 382 U.S. 990, 86 S.Ct. 564, 15 L.Ed.2d 474 (1966). "The term 'flight' is often misused for 'departure.' Departure from the scene after a crime has been committed, of itself, does not warrant an inference of guilt . . . . For departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt." *Id.* (citations omitted).

**23.** See text *supra* at note 21.

**24.** *Terry v. Ohio, supra* note 2, 392 U.S. at 13, 88 S.Ct. at 1875, 20 L.Ed.2d at 901.

**25.** See *United States v. Coates,* 161 U.S.App. D.C. 334, 338, 495 F.2d 160, 164 (1974).

**26.** See text *supra* at note 8.

**27.** See text *supra* at note 10.

**28.** Compare *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *United States v. Page,* 298 A.2d 233 (D.C.Ct.App. 1972).