UNITED STATES of America

v.

**Ellis William MATTHEWS, Jr.
and Jerome Artis.**

Crim. No. 76–58.

United States District Court,
E. D. Pennsylvania.

July 12, 1976.

---

William J. Winning, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Edward C. Connolly, Connolly, McAndrews, Kihm & Stevens, Warminster, Pa., for Artis.

Robert G. Hanna, Jr., Marshall, Dennehey & Warner, Philadelphia, Pa., for Matthews.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

Presently before the Court are motions of defendants Ellis William Matthews, Jr. and Jerome Artis for a judgment of acquittal and/or a new trial. On April 7, 1976, the jury returned a verdict of guilty to all four counts of the indictment charging both defendants in Counts I, II and III with bank robbery and larceny and in Count IV with conspiracy to commit bank robbery and larceny. The Court has determined that the defendants' motions are without merit and must be denied.

*Motion To Suppress Physical Evidence.*

Both defendants argue that the Court erred in denying their motions to suppress all evidence and testimony which resulted from their allegedly unlawful apprehension. At a pretrial hearing on both defendants' motions to suppress, Officer Michael Norman, a police officer in Lower Merion Township, testified that: On January 21, 1976, he was on duty at the Lower Merion Township Police Station, 17 East Lancaster Avenue, Ardmore, Pennsylvania. (Suppression Hearing 13).[1] At approximately 1:00 p. m., a police radio broadcast reported that three black males wearing coats had entered and taken money from the Haverford branch of the Bryn Mawr Trust Company on Lancaster Avenue, Haverford, Pennsylvania. (S. 14, 15). Officer Norman immediately entered his patrol vehicle and drove east on Lancaster Avenue proceeding in a direction away form the bank and toward Philadelphia. Upon approaching the intersection of Lancaster Avenue and Church Road, Officer Norman entered the center lane of traffic on Lancaster Avenue, intending to turn left onto Church Road, which was approximately two blocks from the police station and one mile from the Haverford branch of the Bryn Mawr Trust Company. (S. 15, 16). While stopped at a red light attempting to make the left-hand turn, he observed a rust colored Chevrolet Nova, driven by a black male who was wearing a print type shirt without a jacket—the weather being very cold. The Chevrolet Nova pulled alongside of him on the right side in the curb lane. The driver, who had short, close-cropped hair and a mustache, turned and glanced at the officer several times. Deciding to follow and stop him, Officer Norman crossed into the right lane behind the suspect's vehicle, put on his red flashing lights and tapped his horn. (S. 17, 18). The suspect's car reduced speed slightly, then suddenly turned into the middle lane of traffic and into the westbound lane for oncoming traffic. The suspect's vehicle then made a left turn through a red traffic light at the intersection of Lancaster

---

1. Hereinafter the Notes of Testimony of the Suppression Hearing will be designated "S.".

Avenue and Old West Wynnewood Road. (S. 23, 24). After several minutes of high-speed pursuit, Officer Norman observed two other black males rise up in the car. (S. 25). Officer Bowler of the Lower Merion Police Department, who had received a radio message that the fleeing car was headed in the direction of Montgomery Avenue and Winding Way, drove his police vehicle to that intersection, got out of his car and signaled the suspect's car to stop. The suspect's car did not stop, but headed directly at him. Officer Bowler jumped to the side of the intersection and shot out the right rear tire of the suspect's car, causing it to come to a stop. (S. 25–28, 57–61). The three occupants in the suspect's car were immediately placed under arrest.

At the suppression hearing, the Government also established that: Following the arrest of Matthews, Officer Vagnozzi, who arrived at the scene in response to Officer Norman's radio message, observed that Matthews had bundles of money which had partially dropped out from under his shirt. (S. 33, 73, 76). Officer Vagnozzi removed the money, which was wrapped in Bryn Mawr Trust Bank wrappers. (S. 74). Officer Dunn, who also arrived at the scene in response to Officer Norman's radio message, stood outside the car and took photographs of its contents. (S. 81). These photographs show that a black plastic bag filled with United States currency was on the back seat of the car and that articles of clothing were on the front seat and on the floor. These items were visible to Officer Dunn from his position outside the car. Officer Dunn maintained surveillance of the car while it was towed to the police station garage, at which time Detective Metz, who then retained custody of the car, removed the articles of clothing and the black plastic bag. The bag was filled with United States currency in Bryn Mawr Trust Company wrappers, banking envelopes, and cards marked with the Bryn Mawr Trust Company name. (S. 89–93).

Officer Norman stated that he attempted to stop the vehicle because of his knowledge of the mode of escape used in connection with a previous bank robbery in Lower Merion Township, as well as information contained in a Pennsylvania State Police Bulletin with which he was familiar. In the previous robbery, the getaway car proceeded east on Lancaster Avenue toward Philadelphia and two subjects were hiding in the trunk of the car. The Pennsylvania State Police Bulletin described how bank robbers were switching cars in fleeing from the scene of the robbery and were hiding one or more of the robbers in the getaway car. (S. 18–22).

Based upon Officer Norman's familiarity with the contents of the State Police Bulletin, his personal knowledge of the mode of escape utilized in a previous bank robbery, the series of glances made by the driver and the fact that the driver did not appear to be wearing a coat despite the coldness of the day, the officer attempted to make an investigatory stop of the vehicle. (S. 17, 38, 39, 43, 44). The officer's attempt to stop the vehicle was initiated several minutes after the robbery and occurred roughly one mile from the scene of the robbery. (S. 21, 22, 51).

Both defendants claim that Officer Norman's initial action constituted an investigatory stop and/or an arrest which they argue is a "seizure" under the Fourth Amendment. The defendants also contend that when judged by the standard of either probable cause or reasonableness, Officer Norman's "seizure" violates the Fourth Amendment. We do not agree with either contention.

Officer Norman testified that he attempted to pull the vehicle off the highway by putting on the red flashing lights in his police car and tapping his horn. In response, the car started to reduce speed slightly, but instead of stopping, the car made a sudden turn, went through a red light, attempted to elude Officer Norman and other police cars which had joined in the case, and attempted to run down Officer Bowler. We hold that under the facts of this case there was no seizure of the car until Officer Bowler shot out the tires of the car at which time there was clearly

sufficient probable cause for the seizure and the arrest of the defendants.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968), the Supreme Court stated that a seizure occurs "[w]henever a police officer accosts an individual and restrains his freedom to walk away." In *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975), the Court said "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." [2] In the case at bar, defendants were never detained in any way or was their freedom at any time restrained.[3] On the contrary, after reducing the speed of their car slightly, the defendants immediately led the police on a highspeed chase. The seizure did not occur when Officer Norman made the futile attempt to stop the car, but rather when the defendants' freedom was restrained by the shooting out of the tires of their car.

▮▮▮ However, even if Officer Norman's conduct in flashing his lights and sounding his horn were viewed as a seizure, his action would not have violated the Fourth Amendment. Although the Supreme Court has not developed precise standards to be applied to vehicular stops, in *Terry v. Ohio,* 88 S.Ct. at 1879, which considered the validity of a policeman stopping, briefly detaining and interrogating a pedestrian, the Court suggested a two point test in determining if a search or seizure meets the test of reasonableness: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." In *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), the Court elaborated on its holding in *Terry* as follows:

> In *Terry* this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to. arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. (Citation omitted).

Thus, under the holdings of *Terry* and *Adams,*[4] Officer Norman acted reasonably in attempting to pull over the defendants' vehicle in order to conduct an investigatory stop. *See also, United States v. Richard,* Criminal No. 75–136, filed April 9, 1976 (3d Cir.); *United States v. Harris,* 406 F.Supp.

---

**2.** In *Manning v. Jarnigan,* 387 F.Supp. 791, 792 (E.D.Tenn.1974), the Court found that the defendant was seized when his "vehicle was stopped unlawfully by these policemen, and his freedom to drive away was admittedly restrained by them." *See also United States v. Ward,* 488 F.2d 162 (9th Cir. 1973).

**3.** In *United States v. Coates,* 161 U.S.App.D.C. 334, 495 F.2d 160, 164 (1974), the Court argued that since police "encounters vary in the degree of intrusion" the legality of each encounter must be judged by standards appropriate to the factual backdrop. In the case at bar, there was no intrusion or restraint of the car or its occupants and therefore no intimidation of the type identified in *Coates* as sought to be curbed by the Fourth Amendment.

**4.** Although defendants rely on a recent Pennsylvania case, *Commonwealth v. Murray,* 460 Pa. 53, 331 A.2d 414 (1975), the admissibility of evidence in a Federal criminal case is governed by Federal constitutional standards and not state law. *See United States v. Armocida,* 515 F.2d 49, 52 (3d Cir. 1975), cert. denied 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84. However, *Murray* is readily distinguishable. *Murray* stands for the proposition that: "A police officer may not interfere with the lawful operation of a single motor vehicle by merely asserting the State's interest in regulating that activity." 331 A.2d at 416. In *Murray,* unlike in our case, there were no facts from which the police could reasonably conclude that criminal activity may have been in progress.

1116, filed December 5, 1975 (E.D.Pa.). Officer Norman testified that the driver of the car glanced at him several times which "added" to his suspicion, that although it was a very cold day the driver was not wearing a coat, that he knew that the bank robbers were black and that the robbery had occurred minutes earlier approximately one mile from the place where he spotted the car.

*Motion To Suppress Artis' Post-Arrest Statement.*

Initially, Artis contends that the statement he made at the Lower Merion Township Police Station following his arrest should have been suppressed because it was the direct result of Officer Norman's allegedly illegal stop. Since we have already found that Artis was legally arrested subsequent to Officer Norman's unsuccessful attempt to effect an investigatory stop, this contention is without merit. Defendant further claims that he did not understand the *Miranda* warning given by Agent Bramley, who did the questioning, and that once he indicated that he wished to remain silent, the questioning should have ceased.

At the suppression hearing, Agent Bramley testified that prior to questioning he read the warning required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) to defendant from the Standard Interrogation Advice of Rights Form, that defendant affirmatively stated that he understood his rights, that after being given the form to read Artis appeared to be reading form the form, that he declined to sign the form and that prior to questioning, Agent Bramley for a second time advised the defendant that he did not have to answer any questions and could stop answering at any time (S. 96–99).[5] In response to a question about his accomplices, Artis asked if he had to answer that question, at which point the Agent readvised him that he didn't have to answer any question that he didn't want to. The defendant then stated that he wished to remain silent on that question and the Agent proceeded to ask other questions, which were answered. When asked a different question about his accomplices, Artis again stated that he did not want to answer that question and wanted to remain silent on it. (S. 99–101).

We do not agree that defendant's initial inquiry concerning the necessity of answering a particular question indicates that he did not understand the *Miranda* warnings, or that Agent Bramley should have ceased all questioning when defendant stated that he wanted to remain silent on a particular question. As heretofore set forth, the warnings were explained and gone over several times, and defendant answered that he understood them. In fact, his willingness to answer certain questions and his refusal to speak when he did not so desire evidences his understanding of his rights and his ability to discern those areas in which he felt a need to preserve his silence. *United States v. Choice,* 392 F.Supp. 460 (E.D.Pa.1975). Defendant explicitly informed the Agent whenever there was a question on which he wished to remain silent; when he finally stated that he did not want to respond to more questions, the Agent terminated the questioning. In *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975), the Supreme Court refined its *Miranda* holding as follows:

> A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored. . . . ." 384 U.S., at 479, 86 S.Ct., at 1630. The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." *Id.,* at 474, 86 S.Ct., at 1627. Through the exercise of his option to terminate questioning he can control the time at which questioning oc-

---

**5.** All of the defendants were advised of their rights immediately after their arrest while at the scene of their apprehension. (S. 36, 62, 67).

curs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.

In this case, Agent Bramley scrupulously honored defendant's right to control the questions that he wished to answer as required by *Miranda* and *Michigan v. Mosley.*

*Racial Composition Of Jury Panel.*

Defendant Matthews, who is black, argues that the Court erred in denying his motion pursuant to 28 U.S.C. § 1867 to strike the jury panel on the grounds that it was not racially representative. The panel in question was composed of 131 persons, 8 of whom were black. From those 131, 42 persons were selected, one of whom was black. There were no blacks on the jury or among the alternates.

■ This argument is without merit. The defendant does not challenge the procedure by which jurors are selected, but merely challenges the result of the selection procedure in this particular case. Although a defendant in a criminal case has the right to a jury selected at random from a fair cross-section of the community, he has no right to be tried by a jury of persons of his race or economic class. *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *United States v. Lewis,* 472 F.2d 252 (3d Cir. 1973); *United States v. Dorsey,* 462 F.2d 361 (3d Cir. 1972), *cert. den.,* 409 U.S. 870, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972).

■ The burden of proving purposeful discrimination is on the defendant. Even if the system does not produce equal representation from each community group, purposeful discrimination may not be assumed. The defendant has not offered any proof whatsoever to support any possible prohibited bias or intent to exclude blacks in the selection process. *United States v. Corbitt,* 368 F.Supp. 881 (E.D.Pa.1973) aff'd 497 F.2d 922 (3d Cir. 1974). Furthermore, the defendant did not comply with the provisions of Section 1867(d) of the Jury Selection and Service Act of 1968, under which

he makes this allegation. Under that section, in order to dismiss an indictment on the ground of substantial failure to comply with the Act, a defendant's motion must contain "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this act . . . ." No sworn statement or testimony under oath was submitted to support the defendant's contention.

*Witness Coercion.*

■ Defendant Matthews argues that the Court improperly intimidated co-defendant Jonathan Perry into taking the Fifth Amendment thus depriving him of the exculpatory testimony of that witness. Perry, who pleaded guilty to two counts of the bank robbery charge in the indictment, had not been sentenced at the time of trial. Upon being informed that Perry would testify for the defense, the Court at sidebar directed that Perry's attorney be contacted. (N.T. 4–59—4–62). When Perry took the stand outside the presence of the jury, the Court asked him if he had consulted with his attorney concerning his rights under the Fifth Amendment and whether he understood those rights and he said yes. (N.T. 4–68, 4–69). Thereafter, Perry stated that he was taking the Fifth Amendment and the Court made a finding that the witness had a valid Fifth Amendment privilege and could not be compelled to testify. (N.T. 4–69, 4–70). The Court neither intimidated nor coerced the witness in any way but properly held that in light of the fact that two counts of the indictment against Perry were still outstanding, and the witness' plea bargain with the Government had not been formally accepted by the Court, Perry could invoke his privilege against self-incrimination. (N.T. 4–71—4–72). *See Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *United States v. Mahady & Mahady,* 512 F.2d 521 (3d Cir. 1975).

■ The defendant further contends that the Court participated in violating the defendant's due process rights by intimating that the plea bargain would not be accepted and that the witness, Perry, would

receive additional time for taking the stand.[6] Not only did the Court never make any such statement, but in open Court Perry's attorney was instructed by the Court to consult with his client to insure that Perry was aware that the plea bargain could not be revoked. The Court stated as follows:

*I also want to make it very clear on the record that this is a plea bargain that has been entered into between the Government and the defendant and I want to state specifically that in my opinion the Government is bound by its agreement; so that, therefore, I want to impress upon his counsel that this plea bargain is still in effect and that the Government, as far as I am concerned, on the basis of any information and evidence that I have, would be bound to honor that agreement.*

Now I am making a finding that he has a right to take the Fifth Amendment under the circumstances that I have just enumerated because I think there is a reasonable probability that if he were to testify in answer to that question he would, in effect, be opening himself up perhaps to further questions and incriminating himself as to it, and there is a reasonable probability that he would incriminate himself as to the indictment.

MR. HANNA: Your Honor, I think the record should also reflect that the Government made it quite clear at the conference we had in your chambers that if Mr. Perry were to testify the Government would move the Court to revoke the plea-bargain agreement.

THE COURT: Mr. Hanna, I certainly take issue with that statement because I happened to be in that conference and what the United States Attorney said was, as far as I can recollect that conference, he thought he might have a right, that the Government might have a right to revoke.

I recall specifically that I told him that before any such statement were made on this record or elsewhere he should check the law.

As a matter of fact, I also recommended to his attorney at that time that they look into that matter.

Did you look into the matter and did you advise your client?

MR. ABRAHAM: Your Honor,—

THE COURT: I am addressing that remark to the witness' attorney.

MR. ABRAHAM: Your Honor, that matter, that specific legal point, was not looked into.

MR. WINNING: Your Honor, it was on the part of the Government and the Government now agrees and can do so in a telephone conversation with someone on your staff that we would have no right to move to revoke a plea bargain based on Criminal Rule 11, which specifically fails to define or describe any right on the part of the Government, particularly in light of the fact, your Honor, that there was no—

THE COURT: *I want to say that if that was in the consideration of Mr. Perry or his counsel at the time they conferred, I believe, that you should right now confer further with your client in connection with that particular matter and advise him as I have stated on this record and as I stated in chambers.*

I cautioned, I believe, counsel for Mr. Perry, as well as counsel for the Government, to check the law on that and not make any representations to Mr. Perry until after they had checked the law.

That, Mr. Hanna, was my understanding of the way that conference went.

Now with that in mind I suggest that if you want you can take him outside.

·   ·   ·   ·   ·

THE COURT: You may leave the stand now and you can talk to your counsel if you feel this is not clear.

---

6. Perry's sentence was never discussed by the Court or anyone else in the Court's presence, and an accusation that it was is completely unfounded. Furthermore, Perry's plea bargain provided that the Government would recommend to the Court that the Court sentence Perry under the Youth Corrections Act.

(The witness and Mr. Abraham left the courtroom for a short period.)

THE COURT: Now I will ask you this:

Counsel, did you advise your client, the witness, as to the statement of the United States Attorney and the Court in the courtroom?

MR. ABRAHAM: Yes, your Honor, I have; and after discussing with Mr. Perry the fact that whether or not he invokes his rights under the Fifth Amendment, the plea bargain is a valid and binding bargain upon the Government, his decision is still to invoke his rights under the Fifth Amendment to that, despite his knowledge that regardless of what he would do the plea bargain would still stand. (N.T. 4–72—4–75). (emphasis added).

Defendant's contention that the Government intended to revoke the plea bargain entered into with Perry is equally frivolous. The Government stated in open court that "we would have no right to revoke a plea bargain." (N.T. 4–73). Furthermore, counsel for Perry stated on the record that Perry intended to invoke the Fifth Amendment "despite his knowledge that regardless of what he would do the plea bargain would still stand." (N.T. 4–75).

*Sufficiency of Evidence.*

Defendant Matthews argues that without the evidence obtained at the time of his arrest, the evidence was insufficient to support his conviction. We have already held that his arrest was valid and the evidence resulting from his arrest properly admitted. Viewing the evidence in a light most favorable to the Government, as we must, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Armocida,* 515 F.2d 29 (3d Cir. 1975); *United States v. Pratt,* 429 F.2d 690 (3d Cir. 1970), we conclude that there was sufficient other evidence, produced at trial, for the jury reasonably to find the defendant guilty beyond a reasonable doubt of the bank robbery.

For all of the aforementioned reasons, we deny the defendants' motion.