OPINION
This is an appeal by the State of Ohio from an order suppressing as evidence a baby food jar and its contents, removed during a pat down, from the jacket pocket of Anthony Landgraf.
We reverse. In the interest of judicial economy, we will utilize the trial court's statement of facts, which is firmly rooted in the testimony of the sole suppression hearing witness, as our own, supplemented by additional testimony as we deem appropriate. For the same reason, we will reproduce the trial court's legal analysis, with which we are in partial, albeit not complete, agreement.
The trial court's decision, order, and entry suppressing the evidence provides as follows:
 (II) FACTS David L. House is a Dayton Police Officer and has been for nine (9) years. Most recently he has been assigned to the Strike Force which is a uniformed portion of the Drug Unit. He has been with that Unit for almost three (3) years. He has significant experience with crack cocaine and other drug usage. He has been involved in hundreds of search warrants, the majority of which were regarding crack cocaine. Prior to being assigned to the Strike Force, House was assigned to the SWAT Team, and in that capacity he was involved in the service of some 200 high risk search warrants. On February 22, 2000, at about 7:25 p.m., House was on Strike Force patrol, in uniform in a marked cruiser. He and his partner were checking the residence at 303 Clover Avenue, which was described as an active crack house. Police officers had made 10 to 15 arrests at this location in the month and a half prior to February 22, 2000. They had performed two (2) "knock and advises" and nuisance abatement procedures were in process. The landlord had been notified concerning drug activity at the address. However, House indicated that the residence contained three (3) apartment units and it was still an active crack house. The officers were specifically checking this address at the date and time in question.
 In front of the house, the officer was flagged-down by a Mr. Crisp who was a neighbor. Crisp told House that he had been watching a black male subject with a red jacket and a black knit cap "serving" customers at that location. House described the term "serving" to mean approaching vehicles of crack customers returning to the residence and appearing to bring drugs to them. The suspect was described as just having turned the corner on Corwin Street (303 Clover is at the corner of Corwin and Clover).
 The officers drove around the corner, and after passing the rear of 303 Clover, saw a black male with a red shirt and a black knit cap on the stairwell at the rear of 303 Clover with the porch light on. House drove a short distance down Corwin, and upon turning around and returning, the suspect was gone and the porch light was off. House returned to the intersection of Corwin and Clover attempting to again find Crisp. At that point, House saw a gray Caviler vehicle parked at the side of the street between 303 and 307 Clover. The vehicle had not been there when House was talking to Crisp two (2) to three (3) minutes earlier. House observed an occupant in the vehicle who ducked down completely out of sight of the marked police cruiser. House described that the defendant appeared to peak back up over the dashboard and then duck down again. House then drove to the front of the Caviler vehicle. The vehicle was parked between 303 and 307 Clover at what House described as a pathway to the rear apartments of the known crack house. When House arrived at the front of the Caviler, the occupant sat up in the vehicle. House got out of his cruiser to make contact with the occupant of the vehicle, and at the same time the black male was walking out of the shadows next to 303 Clover and appeared to be going to the Defendant's vehicle, but never made contact.
 House had the occupant of the Caviler exit the vehicle and he was later found to be identified as the Defendant, Anthony Francis Landgraf. The Defendant was cooperative but House indicated that because of the high crime area, weapons associated with drugs and not knowing whether the Defendant had been trying to hide something in the vehicle, House patted him down for his safety. During the pat-down, House felt a pocket knife with a folding type clip and this was removed from the Defendant. House continued the pat-down. The Defendant was wearing a jean type jacket and in the right pocket a hard object was felt which, House testified, he "immediately recognized" as a baby food jar. Out of "just curiosity" or to give the Defendant an opportunity to explain, House asked the Defendant what was in the jar. The Defendant stated he did not know. At that point, House thought something might be in the jar that should not be there. However, House clearly indicated the (sic) he removed the jar from the Defendant and placed it on the rear of the vehicle mostly for his safety because he did not know what was in it and believed it could be used as a weapon. House believed there was further investigation to be done as far as checking the Defendant's vehicle, identifying the Defendant, and determining if he was wanted.
 Once the baby food jar was removed from the Defendant, House observed that the baby food jar contained a liquid and a white colored sediment in the bottom. From his experience, House believed that to be water and powdered cocaine (cocaine mixed with baking soda). House described that the mixing of the powdered cocaine with water, and heating it, is a part of the process of removing the baking soda and producing pure cocaine commonly known as crack.
 Eventually, the Defendant was placed under arrest and House described that he read the Defendant his Rights by use of a Rights card provided by the Montgomery County Prosecutor's Office. After each Right he asked the Defendant if the Defendant understood and received an acknowledgment from the Defendant. After completing the Rights, the defendant stated that he wanted to talk to an attorney. No interrogation was conducted at that time.
 Nevertheless, the Defendant eventually made a voluntary statement. Neither House nor House's partner were talking to the Defendant at the time the statement was made. The statement was described as unsolicited.
 (III) LAW AND ANALYSIS Police officers may make an investigative stop of persons suspected of drug offenses when the officers have a reasonable and articulable suspicion that the person stopped is engaged in criminal activity. Terry v. Ohio (1968), 392 U.S. 1; Delaware v. Prouse
(1979), 440 U.S. 648; Dayton v. Erickson (1996), 76 Ohio St.3d 3, 665 N.E.2d 1091. Furthermore, the articulable reasonable suspicion must be viewed in light of the totality of the surrounding circumstances. State v. Freeman (1980), 64 Ohio St.2d 291, 414 N.E.2d 1044. Finally, the circumstances are to be viewed through the eyes of a reasonable and prudent police officer on the scene who must react to events as they unfold. United States v. Hall (Ct.App. DC cir. 1976) 525 F.2d 857, 859.
 In the case before the Court, the Officer was on patrol checking out a known and active crack house due to a report of suspected drug activity received from a neighbor in the area. This led the officer to find the Defendant in his vehicle, parked outside of the crack house, hiding and peaking up over the dashboard while the described black male, thought to be conducting the reported drug activity, was observed by the officer approaching the car. The Court finds these facts as supporting a reasonable and articulable basis for a suspicion that the Defendant was engaged in criminal activity. Additionally, the testimony given by the Officer that he patted the Defendant down for his own safety due to the location of the stop taking place in a high crime area, the known association between weapons and drugs, and the fact that he did not know if the Defendant had been trying to hide something in the vehicle allows the Court to find that Officer House, as a reasonable and prudent police officer, had a legitimate suspicion and reason to perform a Terry pat-down search.
 To justify a Terry pat-down search it must be shown that the search was conducted for the protection of the police officer and others nearby, ". . . and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs or other hidden weapons for the assault of the police officer." Terry, supra. It has been held that a Terry pat-down cannot be used to search a suspect solely for evidence. State v. White (1996), 110 App.3d 347.
 If the unknown object is hard, and its size or density is such that it might be a weapon, the officer may remove the object to ensure his safety. State v. Evans (1993), 67 Ohio St.3d 405 (emphasis added). Contraband evidence found during a Terry pat-down may be admissible into evidence when the police officer feels a hard object and is unable to determine that the object is not a weapon. Id. (emphasis added). When it is immediately apparent to the officer from the way the object feels that it is not a weapon and is contraband, the officer may retrieve the object if he has probable cause to believe the item is contraband. Minnesota v. Dickerson (1993), 508 U.S. 366; State v. Brown (Feb. 9, 1996), Montgomery County Ct. App. Case No. 15300, unreported.
 The Court's interpretation of these principles allows that only unknown objects that are of a size and density of a weapon may be removed from the person during a Terry search. The Ohio Revised Code defines a weapon to be "any instrument, device, or thing capable of inflicting death and designed or specially adapted for use as a weapon or possessed, carried or used as a weapon." R.C. 2923.11(A). In this case, Officer House testified that he immediately knew the hard object inside the defendant's jacket was a baby food jar. It was made clear by Officer House that the baby food jar was removed for his safety and because he thought the jar could be used as a weapon. Officer House did not articulate in his testimony that he thought the jar contained contraband. The Court concludes that the State failed to demonstrate a reasonable and articulable suspicion that the baby food jar was a weapon or considered a weapon. Since the powdered cocaine was discovered after the jar was removed from the defendant without probable cause, the evidence must be suppressed.
 (IV) CONCLUSION For the reasons detailed herein, the Court finds that the Officer had a reasonable and articulable suspicion that criminal activity was taking place and the Terry pat-down of the Defendant was justified. However, the Court concludes that the officer knew the object to be a baby food jar prior to its removal from the Defendant and that the known baby food jar could not be removed from the Defendant as an unknown weapon. Therefore, the Defendant's Motion to Suppress is SUSTAINED.
 Although not elaborated upon by the trial court, Officer House spoke at some length about his reason for removing the baby food jar from Landgraf's pocket.
 The reason I removed the baby food jar from his pocket is the fact that I'm dealing with Mr. Landgraf. I know that there is further investigation has to take place. Uh . . . I don't know if the vehicle that Mr. Landgraf is sitting in is a stolen vehicle. I don't know if there is a weapon in the lunge area that Mr. — of Mr. Landgraf's vehicle, that he might've concealed while he was ducked out of my sight, and I know that I still have to check that area.
 At that point in time, I did not want this hard glass jar to be possibly used as a weapon against me. Uh . . . so I simply removed it from his pocket, I set it on the trunk of my car.
 * * * . . . the main concern for removing the jar from his pocket at that point in time was that I had much more further investigation to do with this individual. As I said, he, uh . . . — it's a glass jar, it's a small, compact jar. Uh . . . it can very easily be used as a blunt object. Uh . . . the jar could be smashed, uh . . . the glass could be used.
 And also, I did not know what was inside the jar. Uh . . . granted it — it could have contained any type of liquid, it — from an acid, a chemical, or it could — it could've contained baby food, uh . . . it could've contained gasoline, I didn't know. And for that reason, I went ahead and removed it.
The State advances a single assignment of error:
 TRIAL COURT ABUSED ITS DISCRETION BY RULING THAT THE BABY FOOD JAR COULD NOT BE REMOVED FROM APPELLANT AS AN UNKNOWN WEAPON.
 The State essentially argues that Officer House was conducting a lawful pat-down during the course of which he felt a baby food jar in Landgraf's pocket which he lawfully removed from Landgraf because he reasonably believed Landgraf could use the jar as a weapon against him.
Landgraf not only argues against the State's position as to the removal of the baby food jar, but further contends that Officer House had no business frisking him at all.
We agree with the trial court's analysis and conclusion that the circumstances justified the pat down. See also State v. Bobo (1988),37 Ohio St.3d 177.
The closer question is that raised by the State's assignment of error. The trial court opined that removal of the baby food jar was impermissible because Officer House knew what it was, and that it was not a weapon, and also lacked probable cause to believe that it contained contraband.
We agree, as apparently does the State, that the trial court correctly determined that the baby food jar was not removable under the "plain feel" doctrine that permits the seizure of contraband.
We disagree with its determination that Officer House failed to reasonably articulate that Landgraf could use the jar or its contents as a weapon against him. The trial court focused upon the definition of "deadly weapon" contained at R.C. 2923.11(A), and apparently concluded that Officer House was required to articulate a reasonable suspicion that the baby food jar could be used by Landgraf as a deadly weapon. Although the legal issue is close, we believe that Officer House's removal of the baby food jar was permissible under the circumstances. Terry v. Ohio
(1967), 392 U.S. 1, acknowledges that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." P. 23. We do not believe that Terry is limited to risks occasioned by deadly weapons, although that is the usual scenario. In our judgment, Officer House reasonably articulated a concern that Landgraf could use the baby food jar to injure him. We thus conclude that a "man of reasonable caution" in his situation was "warrant(ed)" in taking the jar from Landgraf's pocket. Id., 21-22.
Accordingly, we sustain the assignment of error.
The order appealed from will be reversed, and the matter will be remanded for further proceedings consistent with this opinion.
BROGAN, J. and YOUNG, J., concur.