OPINION
{¶ 1} Defendant, Thomas Harrison, was convicted on his pleas of no contest of trafficking in crack cocaine between one and five grams, R.C. 2925.03(A)(1), possession of crack cocaine, between one and five grams, R.C. 2925.11(A), and possession of criminal tools, a cell phone, R.C. 2923.24(A). *Page 2 
The trial court imposed a sentence of five years of community control sanctions.
 {¶ 2} Defendant entered his no contest pleas after the trial court denied a Crim. R. 12(C)(3) motion to suppress evidence police seized from Defendant in the course of a Terry stop.
 {¶ 3} On February 27, 2007, at about 8:20 p.m., Dayton Police Detectives House and Emerson were on patrol in an unmarked police vehicle in the area of Gettysburg Avenue and West Third Street in Dayton. Also in the vicinity was Detective Gaier. All three detectives are experienced in narcotics investigations and arrests. They testified that Gettysburg Avenue and West Third Street is an area known for illegal drug activity.
 {¶ 4} House and Emerson observed a white GMC "Jimmy" pull into the BP station at 4024 West Third Street and stop at a gas pump. Moments later, a blue Ford minivan pulled in and stopped behind the GMC. This caught the officers' attention, because there was no gas pump where the minivan had stopped, and other pumps were open and available for customers' use.
 {¶ 5} A passenger emerged from the GMC and walked back to the minivan. When House and Emerson pulled their vehicle into the station lot, another passenger in the minivan appeared to *Page 3 
alert the driver, Defendant Harrison, who immediately drove the minivan around the GMC and off the lot.
 {¶ 6} By this time, the driver of the GMC had begun to pump gas into his vehicle, and he became irate when he saw the minivan pull away. The driver of the GMC laid the nozzle of the pump he was using on the ground and drove the GMC forward to the next pump. The driver then walked to the rear of the GMC and made a call using his cell phone. House heard the driver say: "I've got it for you right here, come on."
 {¶ 7} House and Emerson then drove their vehicle off the station lot and down the street. However, Detective Gaier, whom they'd called to the scene, continued to observe the BP station lot from across the street.
 {¶ 8} As they drove down Third Street, House and Emerson saw the same blue minivan traveling back toward the BP station. Gaier saw the minivan, driven by Defendant Harrison, pull onto the station lot and stop at the gas pump that the GMC had vacated. The driver of the GMC then walked to the minivan, spoke with Defendant, and began to pump gas into Defendant's minivan using the nozzle he had laid on the ground. With that, House and Emerson returned to the lot and stopped their vehicle in front of Defendant's.
 {¶ 9} The officers testified that the BP station is a *Page 4 
location where drug transactions often occur. They also stated that, from their experience, persons who purchase narcotics sometimes pay by pumping gasoline into the drug dealer's vehicle.
 {¶ 10} When the officer approached Defendant's minivan to investigate, his hands were below the dashboard and out of view. House called out three times to "put your hands up" before Defendant did. That caused House concern for his safety, and he decided to open the driver's door of Defendant's minivan to determine whether Defendant had a weapon. When he did, House saw a plastic baggie of crack cocaine in the map pocket of the door, and he seized it. Defendant was removed from the vehicle and arrested.
 {¶ 11} Defendant moved to suppress the evidence police seized from his vehicle and statements he made to police. The trial court denied the motion. The court found that police had reasonable and articulable suspicion sufficient to detain Defendant and to open the door of his vehicle to determine whether he was armed and a danger to their safety, and that they were authorized to seize the drugs they then saw in plain view, giving them probable cause for Defendant's arrest. The court also denied Defendant's motion to suppress evidence of statements he made. On appeal, Defendant challenges only the *Page 5 
seizure of evidence from his vehicle.
ASSIGNMENT OF ERROR
 {¶ 12} "THE TRIAL COURT ERRED IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS."
 {¶ 13} Defendant argues that the trial court erred in overruling his motion to suppress because police lacked the reasonable suspicion of criminal activity necessary for an investigative stop of Defendant's vehicle, and they further lacked a reasonable belief that Defendant might be armed and dangerous sufficient to justify opening Defendant's driver's door for safety reasons.
 {¶ 14} Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject to only a few well recognized exceptions.Katz v. United States (1967), 389 U.S. 347, 88 S.Ct. 507,19 L.Ed.2d 576. One of those exceptions is the rule regarding investigative stops, announced in Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868,20 L.Ed.2d 889, which provides that a police officer may stop an individual to investigate unusual behavior, even absent a prior judicial warrant or probable cause to arrest, where the officer has a reasonable, articulable suspicion that specific criminal activity may be afoot.
 {¶ 15} An officer's inchoate hunch or suspicion will not *Page 6 
justify an investigatory stop. Terry. Rather, justification for a particular seizure must be based upon specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion. Id. The facts must be judged against an objective standard: whether the facts available to the officer at the moment of seizure or search would warrant a person of reasonable caution in the belief that the action taken was appropriate. Id. See, also,State v. Grayson (1991), 72 Ohio App.3d 283.
 {¶ 16} Whether an investigative stop is reasonable must be determined from the totality of the circumstances that surround it. State v.Freeman (1980), 64 Ohio St.2d 291. The totality of the circumstances are "to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." State v.Andrews (1991), 57 Ohio St.3d 86, 87-88, citing United States v.Hall (C.A.D.C. 1976), 525 F.2d 857, 859; State v. Freeman, supra, at 295.
 {¶ 17} Defendant argues that the officers' knowledge of drug activity in the area where the BP station is located, coupled with their experience that drug sales sometimes involve the buyer purchasing gas for the dealer, was not *Page 7 
sufficient to demonstrate a reasonable and articulable suspicion of criminal activity.
 {¶ 18} The Supreme Court of Ohio has held that "[t]he reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely in determining whether an investigative stop is warranted." State v. Bobo (1976), 37 Ohio St.3d 177, 179. That fact, standing alone, is insufficient for a Terry stop, however. The totality of the facts and circumstances before the officers must reasonably suggest that some specific criminal activity is afoot.State v. Maldonado (Sept. 24, 1993), Montgomery App. No. 13530.
 {¶ 19} Defendant argues that because "pumping gas for someone else is something people commonly do," and "these factors do not constitute the reasonable and articulable suspicion required to justify a stop" authorized by Terry. (Brief, p. 5).
 {¶ 20} It may be that some people purchase and pump gas for others. Defendant's trial counsel contended that it is a practice in which he and his wife engage. However, the issue is not whether particular conduct can be innocuous, or is sometimes suspicious, but whether a given set of circumstances, in their totality, reasonably suggests that *Page 8 
criminal activity is afoot.
 {¶ 21} The movement of Defendant's minivan into the BP station, to a point behind the GMC, stopping where there was no gas pump, then leaving when police were seen, are furtive movements that portrayed suspicious activity. State v. Bobo. The driver of the GMC's call to someone that, "I've got it for you right here, come on," followed by the return of the minivan, and the GMC's driver's conduct in pumping gas into the minivan's tank, coupled with the officers' experience with that location and that drugs are sold in that way, supported a reasonable suspicion that a sale of drugs was occurring. On that basis, the officers were authorized to detain the persons involved in order to investigate their suspicion.
 {¶ 22} Officers are permitted to perform a reasonable search for weapons for the protection of officers and others nearby, where officers reasonably suspect that a person detained for investigation may be armed and dangerous. Terry, 392 U.S., at 27. "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or `hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Id., 392 U.S., at 27. *Page 9 
 {¶ 23} When House approached Defendant's vehicle, he called out: "Dayton Police," and "put your hands up," repeating the direction three times before Defendant raised his hands to where they could be seen. The officers were in unmarked vehicles and plain clothes, but House and Emerson also wore vests marked "Police" over their clothing. House could reasonably infer that Defendant was slow to act because he had a weapon in his person or in the vehicle that he had positioned for use, especially because it appeared that a sale of illegal drugs was involved. House was authorized to perform a minimally intrusive search to investigate his suspicion, and opening the door of Defendant's vehicle was a reasonable means of doing that. When he did, House saw what he believed to be crack cocaine in plain view, and he seized the drugs and arrested Defendant.
 {¶ 24} Objects falling in plain view of an officer who has a right to be in a position to have that view are subject to seizure when their criminal character is readily apparent. Harris v. United States (1968),390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067. Defendant does not contend that the criminal character of the drugs House seized was not immediately apparent to him. Defendant's contention is that the officers had no right to be where they saw the drugs because the stop and discovery were unreasonable. Our finding that the *Page 10 
officers were authorized to act as they did in discovering the drugs in plain view resolves the error assigned.
 {¶ 25} The assignment of error is overruled. The judgment of the trial court will be affirmed.
FAIN, J. And DONOVAN, J., concur.
R. Lynn Nothstine, Esq. Edmund G. Loikoc, Esq. Thomas E. Harrison Hon. Michael T. Hall *Page 1