[Cite as *State v. Essad*, 2017-Ohio-2913.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

STATE OF OHIO

    Appellant

    v.

DANIEL M. ESSAD
KIMBERLY M. BENSON

    Appellees

C.A. Nos.    16CA010950
               16CA010951

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE Nos.    15CA090977
                15CR090976

DECISION AND JOURNAL ENTRY

Dated: May 22, 2017

---

CARR, Presiding Judge.

{¶1} Appellant, the State of Ohio, appeals from the judgment of the Lorain County Court of Common Pleas, granting Defendant-Appellees, Daniel Essad and Kimberly Benson's, joint motion to suppress. This Court reverses and remands for further proceedings.

I.

{¶2} On the afternoon of January 21, 2015, Benson and Essad were traveling eastbound on the Ohio Turnpike in Essad's pick-up truck. Benson was driving the truck, and Essad was seated on the passenger's side. As the two approached mile post 133, they were observed by two Ohio State Highway Patrolmen. Both patrolmen were parked in a crossover in the middle of the turnpike. They sat alongside each other in two different cruisers, both of which pointed to the south. Sergeant Neil Laughlin was operating the cruiser on the west-hand side, and his partner that day, Trooper Michael Trader, was parked to his left.

{¶3} According to Sergeant Laughlin, he first noticed Benson and Essad's truck because he saw the truck make a "rapid speed reduction," consistent with the driver either slamming on the brakes or "abruptly letting off the gas." The truck then continued to travel at a lower rate of speed as it passed his cruiser. Trooper Trader also noticed the truck because it appeared to be traveling below the speed limit. As the truck passed the two troopers, both observed that the driver (Benson) and passenger (Essad) appeared to have "very stiff" or "very rigid posture[s]." Trooper Trader then turned to his right to discuss his observations with Sergeant Laughlin. Meanwhile, Sergeant Laughlin continued to watch the truck. As he was watching, he witnessed the truck cross over the right lane marker by approximately a tire width for a few seconds before returning to its lane of travel. Based on his observations, he decided to exit the crossover and follow the truck.

{¶4} Sergeant Laughlin ultimately stopped the truck somewhere between mile post 135 and 136. According to the sergeant, he observed an additional traffic violation before stopping the truck because it moved from the right-hand lane to the middle lane without signaling. His dash cam recording, however, did not capture the lane change.

{¶5} Trooper Trader independently decided to join Sergeant Laughlin at some point during the stop. Because Sergeant Laughlin's interactions with Benson and Essad led him to believe that they might be engaging in criminal activity, he asked Trooper Trader to take his canine around the truck. The canine soon alerted to the bed of the truck, which the troopers then searched. Inside the truck bed, the troopers discovered over 200 pounds of marijuana.

{¶6} Benson and Essad were each indicted on one count of trafficking in marijuana and one count of possessing marijuana. They filed a joint motion to suppress, and the trial court held a hearing over the course of two days: November 30, 2015 and February 24, 2016. Following

the hearing, the court allowed the parties to file additional briefs. Benson and Essad filed a joint brief, and the State filed a response. The court then reviewed the filings and granted the joint motion to suppress. The court determined that Sergeant Laughlin lacked reasonable suspicion to execute a traffic stop.

{¶7} The State now appeals from the trial court's order and raises two assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

> THE TRIAL COURT ERRED IN GRANTING MS. BENSON'S AND MR. ESSAD'S JOINT MOTION TO SUPPRESS BECAUSE THE FINDINGS OF FACT ARE NOT SUPPORTED BY COMPETENT, CREDIBLE EVIDENCE.

{¶8} In its first assignment of error, the State argues that the trial court erred when it granted Essad and Benson's motion to suppress on the basis of incorrect factual findings. For the reasons set forth below, we sustain the State's first assignment of error.

{¶9} A motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Thus, a reviewing court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997). We emphasize, however, that "'[t]his Court must only accept the trial court's findings of fact if they are supported by competent, credible

evidence.'" *State v. Hendrix*, 9th Dist. Summit Nos. 26648, 26649, 2013-Ohio-2430, ¶ 14, quoting *State v. Figueroa*, 9th Dist. Lorain No. 09CA009612, 2010-Ohio-189, ¶ 20.

{¶10} The Fourth Amendment to the United States Constitution and Section 14, Article 1 of the Ohio Constitution proscribe unreasonable searches and seizures. To justify an investigative stop, an officer must point to "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Maumee v. Weisner*, 87 Ohio St.3d 295, 299 (1999), quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968). In evaluating the facts and inferences supporting the stop, a court must consider the totality of the circumstances as "'viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *State v. Bobo*, 37 Ohio St.3d 177, 179 (1988), quoting *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir.1976). This Court has repeatedly recognized that "'[a]n officer may stop a vehicle to investigate a suspected violation of a traffic law.'" *State v. Slates*, 9th Dist. Summit No. 25019, 2011-Ohio-295, ¶ 23, quoting *State v. Sunday*, 9th Dist. Summit No. 22917, 2006-Ohio-2984, ¶ 29. *Accord State v. Carano*, 9th Dist. Summit No. 26544, 2013-Ohio-1633, ¶ 8, quoting *State v. Campbell*, 9th Dist. Medina No. 05CA0032-M, 2005-Ohio-4361, ¶ 11.

{¶11} "R.C. 4511.33(A)(1) requires drivers traveling on two or more lane roads to drive, 'as nearly as practicable, entirely within a single lane or line of traffic' and not to move from that lane or line 'until the driver has first ascertained such movement can be made with safety.'" *State v. Graham*, 9th Dist. Lorain No. 13CA010489, 2014-Ohio-3283, ¶ 23. *Accord State v. Casas*, 9th Dist. Medina Nos. 2451-M, 2452-M, 1996 WL 48551, *1 (Feb. 7, 1996) ("Crossing a road's right edge line is a traffic violation pursuant to R.C. 4511.33(A)."). "A traffic stop is constitutionally valid when a law-enforcement officer witnesses a motorist drift over the lane

markings in violation of R.C. 4511.33, even without further evidence of erratic or unsafe driving." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, syllabus. *Accord State v. Davis*, 9th Dist. Lorain No. 14CA010639, 2015-Ohio-4218, ¶ 12-14.

{¶12} The trial court found that, when this incident occurred, Benson and Essad were traveling eastbound on the Ohio Turnpike and Benson was driving Essad's truck, which had Nevada license plates. The court found that Sergeant Laughlin and Trooper Trader were stationed at the crossover near mile post 133, with their cruisers facing south and with Sergeant Laughlin's cruiser positioned to the west/right of Trooper Trader's. The court found that, while the troopers had the same view of the eastbound traffic, they had "very different observations about the events * * *." Only Sergeant Laughlin testified regarding a sudden speed reduction by the truck while Trooper Trader, "did not see any sudden braking." Further, the court found that, while Sergeant Laughlin claimed to have seen "the passenger side right tire of the [truck] touch the solid white line of the roadway for a second or two," Trooper Trader did not see any infraction because he had stopped watching the truck. The court acknowledged that both troopers had "testified in detail about the tense appearance of the occupants." The court found, however, that "[o]ne could interpret Trooper Trader['s] failure to maintain focus on the [truck] after it passed in front of him as proof that there was nothing suspicious about it."

{¶13} The trial court found that Sergeant Laughlin also claimed to have observed Benson fail to signal a lane change during his pursuit, but that his claim was not supported by the dash cam video. The court found that the sergeant and Trooper Trader had "compiled a stellar record of drug seizures" on the turnpike and that "half of their most recent drug seizures (during the past 12 months) involve[d] drugs found in cars with out of state license plates." The court noted its concern that their success might mean the troopers were "using traffic stops as a pretext

for searches and seizures." The court specified that it had "concerns of credibility" due to (1) Trooper Trader's inability to corroborate "the 'sudden braking' or the 'tire on the white line,'" and (2) the fact that the dash cam video did not capture the lane change violation that allegedly occurred during Sergeant Laughlin's pursuit. The court concluded, based on the totality of the circumstances, that the record did not contain competent, credible evidence to support a finding that Sergeant Laughlin had reasonable suspicion to execute a traffic stop.

{¶14} Sergeant Laughlin testified that Benson and Essad's truck was traveling eastbound in the right-hand lane of the turnpike when he first observed it. He noticed the truck make a "rapid speed reduction," consistent with the driver either slamming on the brakes or "abruptly letting off the gas." The truck then continued to travel at a lower rate of speed as it passed his cruiser, and Sergeant Laughlin was able to observe its occupants. He testified that both occupants were staring straight ahead and had a "very rigid and uncomfortable" posture that was distinctly different from "normal, typical behavior of driving down the road with somebody else * * *." After the truck passed his cruiser, he saw it drive "over the lane marker * * * by approximately a tire width [for] * * * two or three seconds." He then decided to exit the crossover and follow the truck. Before doing so, he told Trooper Trader that he intended to follow the truck.

{¶15} It is not clear from the record the point at which Trooper Trader first observed Benson and Essad's truck. Accordingly, while he did not see any rapid reduction in speed on their part, it is not clear that he began looking at the truck at the same time as Sergeant Laughlin. His testimony was simply that the truck first caught his attention because it was traveling below the speed limit as it approached.

{¶16} Much like Sergeant Laughlin, Trooper Trader testified that he took note of the truck's occupants as they passed his cruiser. He specified that they "looked very uncomfortable, like a couple of statutes, very stiff in the vehicle." He testified that he did not watch the truck after it passed his cruiser because he turned to the right to speak with Sergeant Laughlin about it. Although he could not recall exactly what he said to the sergeant, he knew he "would have told him what [he] observed when [the truck] went by because it caught [his] attention." Trooper Trader acknowledged that he would not have executed a traffic stop based strictly on the truck's slow speed and the rigid posture he observed. He testified, however, that having made those observations, "[he] would pull from the crossover and [he] would go monitor their traffic and see what was next." He confirmed that Sergeant Laughlin did so not long after he turned to speak with him about the truck. He could not recall what Sergeant Laughlin said to him before exiting the crossover, but stated that it "could have been either," "'I've got probable cause'" or "'I'm going to take a look at them.'"

{¶17} Having reviewed the record, we agree with the State's contention that the trial court's factual findings are not based on competent, credible evidence. First, the trial court found that Sergeant Laughlin testified to having seen "the passenger side right tire of [Benson and Essad's truck] *touch* the solid white line of the roadway for a second or two." (Emphasis added.) In two additional places in the court's journal entry, it also referred to the sergeant having testified that the truck's tire was *on* the white line. Sergeant Laughlin repeatedly testified, however, that he saw the truck drive completely over the lane marker "by approximately a tire width" for several seconds before returning to its lane of travel. It was not his testimony that the truck's tire only touched the line or that the truck only drove on the line.

{¶18} Second, and more importantly, the court found that "[o]ne could interpret Trooper Trader['s] failure to maintain focus on the [truck] after it passed in front of him as proof that there was nothing suspicious about it." Trooper Trader testified, however, that he stopped looking at the truck once it passed in front of him because he turned to his right to speak with Sergeant Laughlin about the truck. He could not recall his exact conversation with the sergeant, but specifically testified that he knew he "would have told [Sergeant Laughlin] what [he] observed when [the truck] went by because it caught [his] attention." He confirmed that his observations would have justified his "pull[ing] from the crossover and * * * monitor[ing] their traffic and see[ing] what was next." Upon review, one could not infer from his testimony that the reason he looked away from the truck was that he did not find it suspicious.

{¶19} We acknowledge that, in reaching its conclusion, the trial court noted that it had "concerns of credibility" regarding Sergeant Laughlin's testimony. *See Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8 (trier of fact best positioned to resolve issues of credibility). The court apparently questioned whether Sergeant Laughlin and Trooper Trader were using traffic stops as pretexts, given their successful history of discovering drugs in out-of-state vehicles on the turnpike. *But see State v. Jackson*, 9th Dist. Summit Nos. 24463, 24501, 2009-Ohio-4336, ¶ 19 ("When an officer has probable cause to believe that a traffic violation is occurring, the stop is not unreasonable under the Fourth Amendment even if the officer had some ulterior motive for making the stop."). It is not clear to this Court, however, that the trial court would have reached the same conclusion if it had before it the correct factual findings, as discussed above. The court did not rely upon the marked lane violation that Sergeant Laughlin observed as a basis for a traffic stop because it found that (1) at most, he only alleged having seen the truck drive on the line, and (2) Trooper Trader could not corroborate the violation, due

to his having dismissed the truck for lack of suspicion. Yet, the record reflects that Sergeant Laughlin repeatedly testified that he saw the truck drive noticeably *over* the line. *See Davis*, 2015-Ohio-4218, at ¶ 13. It further reflects that Trooper Trader stopped watching the truck because he turned to talk to the sergeant *about the truck* and the fact that its occupants had caught his attention. Accordingly, the court's factual findings are not based on competent, credible evidence.

{¶20} This Court cannot address a trial court's application of the law on a motion to suppress when "'its factual findings are not supported by competent, credible evidence'" and "[t]he court's conclusion might have been otherwise if based upon factually accurate findings." *Hendrix*, 2013-Ohio-2430, at ¶ 14, quoting *State v. Liscoe*, 9th Dist. Summit No. 25441, 2011-Ohio-1054, ¶ 14. "Because the evidence does not support the court's factual findings, we must conclude that the court erred by granting [the joint] motion to suppress." *Liscoe* at ¶ 14. Accordingly, the State's first assignment of error is sustained on that basis.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN GRANTING MS. BENSON'S AND MR. ESSAD'S JOINT MOTION TO SUPPRESS BECAUSE THE TRIAL COURT INCORRECTLY FOUND THAT SERGEANT LAUGHLIN DID NOT HAVE A REASONABLE, ARTICULABLE SUSPICION TO EFFECTUATE A TRAFFIC STOP.

{¶21} In its second assignment of error, the State challenges the trial court's ultimate determination that Sergeant Laughlin lacked reasonable suspicion to execute a traffic stop. Based on our resolution of the State's first assignment of error, its second assignment of error is not yet ripe for review. Accordingly, we decline to address it. *See State v. Liebling*, 9th Dist. Lorain No. 12CA010203, 2012-Ohio-5818, ¶ 11-12.

III.

**{¶22}** The State's first assignment of error is sustained, and its second assignment of error is not yet ripe for review. The judgment of the Lorain County Court of Common Pleas is reversed, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellees.

DONNA J. CARR
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

DENNIS P. WILL, Prosecuting Attorney, and NATASHA RUIZ GUERRIERI, Assistant Prosecuting Attorney, for Appellant.

JOSEPH A. DELGUYD, Attorney at Law, for Appellee.

IAN N. FRIEDMAN, Attorney at Law, for Apellee.